IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Camden Division

IMAD DAWARA,
    Petitioner,

v.                                          Civ. No.: _____

R. THOMPSON,
    Warden, FCI Fort Dix,
    Respondent.
_____/

PETITIONER'S MEMORANDUM OF LAW IN SUPPORT
OF HIS PETITION FOR EXPEDITED REVIEW
FOR WRIT OF HABEAS CORPUS
Pursuant to 18 U.S.C. § 2241

On the brief:

Imad Dawara
Petitioner Pro Se
Reg. No. 69939-066
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ
08640-5433

I. INTRODUCTION

Imad Dawara, "Petitioner" pro se, appearing in the above-captioned matter and hereby respectfully petitions this Honorable Court for the issuance of an Order granting a Writ of Habeas Corpus in accordance with Section 2241 of Title 28 of the United States code. Petitioner seeks emergency injunctive relief on the grounds listed hereinbelow.

a. Parties

1. Petitioner, Imad Dawara, Reg. No. 69939-066 is a federal prisoner currently held in the custody of the Federal Bureau of Prisons ("BOP") at Federal Correctional Institution ("FCI") Fort Dix, located at Joint Base Maguire-Dix-Lakehurst ("JB MDL"), a military installation located in southern New Jersey, in the county of Burlington.

2. Respondent, Ms. R. Thompson, is the current warden of FCI Fort Dix, and an employee of the Department of Justice, Federal Bureau of Prisons. Warden Thompson is the federal official currently having custody of the Petitioner during his incarceration and is thus properly named as the Respondent in this habeas action. See 28 U.S.C. §§ 2241, 2242.

b. Jurisdiction and Venue

This litigation is a civil action seeking habeas corpus relief under 28 U.S.C. § 2241. Petitioner asserts that he is being held in violation of the Constitution and laws of the United States. Thus, 28 U.S.C. § 2241 confers the subject-matter jurisdiction upon this Court.

Petitioner specifically challenges the BOP's refusal to place Petitioner on home confinement under the CARES Act of 2020, and alleges that refusal is a violation of his Constitutional rights to equal protection under

the law and his due process rights, which are protected under the Fifth and Fourteenth Amendments to the U.S. Constitution, and violate the "cruel and unusual punishment" prohibitive under the Eighth Amendment. These violations are due to BOP's erroneous designation of Petitioner as a "violent offender," which effectively rendered him as <u>ineligible</u> for placement on home confinement under the CARES Act, even as Petitioner is suffering from a serious and emergent medical condition which elevates his risk to infectious diseases like COVID-19, meningitis, influenza, chicken pox, and shingles, etc. Petitioner challenges the determination by the BOP that his inchoate conspiracy conviction is violent. Petitioner further alleges that BOP has made an erroneous determination that he has a past history of a violent offense. Petitioner argues that BOP has wrongfully utilized an outdated definition of a violent offense in BOP Program Statement § 5162.05.

Therefore, this is a "federal question" concerning laws of the United States, and interpretation of those laws by a federal agency. As such, the subject-matter jurisdiction of this Court is hereby properly invoked under 28 U.S.C. § 1331.

As Petitioner challenges the administrative actions of the BOP which implicate and deprive the Petitioner of his civil rights and liberty interests under the Constitution's Fifth, Eighth, and Fourteenth Amendments, the subject-matter jurisdiction of this Court is hereby and properly invoked under 28 U.S.C. § 1343(a)(3) and (4) and under the Administrative Procedures Act, 5 U.S.C. §§ 701-706. Additionally, this Court's jurisdiction may be supplemented by the availability of remedies provided by the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the All Writs Act, 28 U.S.C. § 1651.

Venue is proper within this district as it is the district of the Petitioner's confinement against the federal officer having custody over the Petitioner's person and the acts and omissions complained of herein have rendered injury upon the Petitioner in this district, under 28 U.S.C. § 1291(b) and (e), and § 2241.

## III. BACKGROUND

### A. Imad Dawara's Underlying Criminal Conviction

On June 22, 2021, Imad Dawara was sentenced after pleading guilty on two counts: Count One (1), Conspiracy to Commit Arson, in violation of 18 U.S.C. § 844(n); and, Count Two (2), Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371. See United States v. Imad Dawara, Case Nos.: 19-cr-414-1, and 20-cr-104-1 (E.D.PA.) (See EXHIBIT A: Judgment in a Criminal Case, dated 6/28/2021)

Petitioner has been in federal custody since October 16, 2019.

Petitioner was sentenced by the Honorable Juan Sanchez, Eastern District Court of Pennsylvania, to a term of 108 months incarceration, with a term of 5 years supervised release.

Petitioner was committed to federal custody on July 7, 2021, with credit for time served on pretrial beginning on October 16, 2019.

### B. Dawara's Medical Background

As early as October 2022, Petitioner began experiencing symptoms of heart disease, as his attached medical records will show. (See EXHIBIT B: Medical Records for Imad Dawara)  Petitioner has experienced episodes of shortness-of-breath, dizziness, chest pain, racing heart beat, and even syncope, which has resulted in seven (7) trips to the hospital via ambulance

4

since June 11th, 2023, with the latest on October 18th. He has notified BOP Health Service's staff dozens of times, and has even gone as far as keeping a daily record of his symptoms. (See EXHIBIT C: Symptom Event Diary)

Petitioner submitted an official request for release to home confinement under the CARES Act as early as April of 2023, due to his elevated risk to infectious diseases. (See EXHIBIT D: Administrative Remedy for CARES) Even as Petitioner meets the guidelines set by Attorney General's William Barr and Merrick Garland for prioritized release to home confinement under CARES, the BOP denied his request on May 8, 2023, because the BOP considered his Conspiracy charge "violent." In the attached exhibit, we see that his counselor on June 6th stated his denial for CARES Act was due to having only served 40% of his sentence, and that the BOP considered his Conspiracy conviction "violent." In fact, Petitioner has served more than 65% of his sentence, and Conspiracy charges are considered inchoate and by definition, non-violent, as will be discussed herein.

Petitioner experienced a heart attack on June 11, 2023, and subsequently received emergency surgery at Deborah Heart and Lung Center on June 12, 2023, to install two stents to open blocked arteries leading into his heart. It was determined that Dawara's smaller heart vessels are also blocked, but these vessels are too small for stents. Petitioner was diagnosed at this time with chronic ischemic heart disease.

Chronic ischemic heart disease, also known as coronary artery disease ("CAD"), is a prevalent cardiovascular condition characterized by the narrowing or blockage of coronary arteries, which supply oxygen and nutrients to the heart muscle. It poses significant health risks, as reduced blood flow to the heart can lead to chest pain (angina) and increse the likelihood of

5

heart attacks.

In addition, on August 16, 2023, Dr. Steven Douedi at Deborah Heart and Lung Center discovered damage to Petitioner's heart, documenting "infarction of the interior wall from apex to base, extending to the apicolateral segment." The doctor explained that this damage was likely the result of the heart attack Petitioner experienced on June 11, 2023, and further explained that the proper treatment and monitoring necessary is not something the Bureau of Prisons is willing to perform. As of September 5, 2023, Petitioner's heart beats at 55% capacity, which has resulted in significant diminishing of oxygen in his blood-stream. He experiences these life-threatening symptoms daily, which means he is routinely unable to walk the 30 minute round-trip to the prison-'s chow hall for meals, three times each day. FCI Fort Dix is the largest federal prison in the country, which means Petitioner is unable to ambulate the compound regularly. At present time he is unable to engage in all normal activities of daily living. As such, this means that his condition is not being adequately managed, and his release to home confinement is warranted.

At present calculation, taking into account 486 days of projected and earned good time credits ("GCT"), and including more than 300 days of federal Earned Time Credits ("FTC"), the Petitioner's projected release date is set for June 16, 2026, without the granting of this motion.

III. DISCUSSION

A. Legal Standard

Title 28, Section 2243 of the United States Code provides in relevant part as follows:

A court, justice or judge entertaining an application for a writ of

6

habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). A pro se habeas petition must be construed liberally. See Hunterson v. DiSabato, 308 F.3d 236, 243 (3d Cir. 2002).

To obtain preliminary injunctive relief, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) irreparable injury if the requested relief is not granted; (3) the granting of preliminary injunction will not result in greater harm to the non-moving party; and (4) the public interest weighs in favor of granting the injunction. Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017), as amended (June 26, 2017).

### B. Analysis

#### 1. Conditions of Confinement

The United States will argue that this Court lacks jurisdiction over this petition because it does not concern the "core" of habeas. "The 'core' habeas corpus action is a prisoner challenging the authority of the entity detaining him to do so, usually on the ground that his predicate sentence or conviction is improper or invalid." McGee v. Martinez, 627 F.3d 933, 935 (3d Cir. 2010) (citing Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002)). Section 2241 "confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the execution of his

sentence." Coady v. Vaughn, 251 F.3d 480, 485 (3d Cir. 2001). "Examples of habeas claims that affect the duration of confinement include parole challenges, loss of good time credits and incorrect sentence calculations." Wragg v. Ortiz, No. 20-5496, 462 F. Supp. 3d 476, 2020 U.S. Dist. LEXIS 92033, 2020 WL 2745247, at *14 (D.N.J. May 27, 2020). "Conversely, when the challenge is to a condition of confinement such that a finding in plaintiff's favor would not alter his sentence or undo his conviction," a civil action IS the proper method to seek relief. Leamer, 288 F.3d at 542.

Petitioner argues that BOP's denial of his CARES Act request to return to home confinement because he is a "violent offender" is erroneous, as his conviction for conspiracy charges are, at the core of the definition of inchoate, non-violent. Petitioner argues that his severe medical circumstance, coupled with BOP's insufficient response to his emergent medical needs make his continued detention within the federal Prisons cruel and unusual, and therefore unconstitutional. The BOP has failed to provide Petitioner with adequate, timely and preventative medical testing, treatment, and follow-up, and is resulting in irreparable harm to Petitioner.

Justice Renee Bumb, District of New Jersey, noted in Wragg, supra, that the Supreme Court in dicta left open the possibility that prisoners might be able to challenge their confinement conditions via a petition for a writ of habeas corpus in exceptional circumstances. See 2020 U.S. Dist. LEXIS 92033, WL at *15 (citing Bell v. Wolfish, 441 U.S. 520, 526 n.6, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); Preiser v. Rodriguez, 411 U.S. 475, 499, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973)).

Petitioner asks this Court to consider his failing medical condition, lack of appropriate testing, treatment and preventative care, and the

emergence of COVID-19 at Petitioner's facility, as an exceptional circumstance, and grant him a writ of habeas corpus. Petitioner is at real risk to suffer irreparable harm in the absence of injunctive relief.

2. Exhaustion of Administrative Remedies

Petitioner sought relief with the BOP by pursuing administrative remedy in accordance with 28 C.F.R. § 542.10-19; BOP Program Statement P1330.18; and, FCI Fort Dix Institutional Supplement FTC 1330.18.

There is an adminstrative remedy exhaustion requirement applicable to Petitioner for writ of habeas corpus under 28 U.S.C. § 2241, but there are exceptions to the requirement. See Cerverizzo v. Yost, 380 F. App. x 115, 116 (3d Cir. 2010) (citing Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 239 n.2 (3d Cir. 2005); Schandelmeier v. Cunningham, 819 F.2d 52, 53 (3d Cir. 1986); Cambino v. Morris, 134 F.3d 156, 171 (3d Cir. 1998) (Roth, J., Concurring)).

The exhaustion requirement may be waived when pursuit of administrative remedies would be futile. Woodall, supra; Fuller v. Rich, 11 F.3d 61, 62 (5th Cir. 1994); Fraley v. U.S. Bureau of Prisons, 1 F.3d 924, 925 (9th Cir. 1993); Taylor v. U.S. Treasury Dep't, 127 F.3d 470, 477 (5th Cir. 1997). Where an inmate alleges the BOP's regulations or procedures themselves are unconstitutional, exhaustion of administrative remedies is excused. See Totaro v. Warden Fort Dix FCI, 742 Fed. App'x 596, 598 (3d Cir. 2018); Gallegos-Hernandez v. United States, 688 F.3d 190, 194 (5th Cir. 2012); Woodall, 432 F.3d at 239 n.2.

As detailed herein, Petitioner will show that exhaustion of administrative remedies in this case would be futile as his medical situation

9

is emergent and severe, and the Bureau of Prisons' administrative remedy process, even while containing an exception for "emergency medical situations", is routinely ignored by the BOP. See BOP Program Statement P.S. 1330.18 § 542.18. "If the Request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the Warden <u>shall</u> respond not later than the third calendar day after filing." (emphasis added)

The time required to exhaust the BOP's administrative remedy process takes approximately six to eight months, and would eliminate the immediate need for remedy Dawara is petitioning this Court for. Therefore, Petitioner is engaging the textual exception to exhausting his administrative remedies available in the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626, that he exhausts those remedies that "are available."

In an effort to not only exhaust his administrative remedies, but also to actually petition BOP to address his serious need for relief, on June 6, 2023, Petitioner submitted a BP-8 "Informal Resolution Form" to his Counselor at FCI Fort Dix. A review of the attached Administrative Remedy will show that Petitioner has sought resolution of this matter with the BOP, pursuant to 28 C.F.R. § 542.13(a), FTD 1330.18, and P1330.18. FCI Fort Dix denied the Petitioner's BP-8 filing on June 27, 2023, which was an untimely denial by BOP.

On July 5, 2023, Petitioner submitted a BP-9 "Request for Administrative Remedy" form to the Warden of FCI Fort Dix, pursuant to 28 C.F.R. § 542.14, FTD 1330.18, and P1330.18. This BP-9 filing was timely-filed by Petitioner, and was assigned Remedy ID Number 1170112-F1.

On August 14, 2023, the Petitioner's BP-9 request for relief was denied by Acting Warden, Andy Cruz. Nor was it even considered by the Warden

10

for the three day "emergency review" protocol.

On August 25, 2023, Petitioner attempted to file his BP-10 "Regional Office Administrative Remedy Appeal" form to BOP's Northeast Regional Director, Ms. Amy Boncher, in Philadelphia, Pennsylvania, pursuant to 28 C.F.R. § 542.15 and P1330.18, but his Counselor was not available to accept any legal mail until August 28th.

Even as BOP policy statement P1330.18 § 542.18 states "[R]esponse shall be made ... by the Regional Director within 30 calendar days." § 542.18 goes on to say "If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended by ... 30 days at the regional level ... Staff shall inform the inmate of this extension in writing."

As of the writing of this brief no response has been received from the Regional Director, nor has the Petitioner received any notice of an extension in writing from the Regional Director. Petitioner's administrative remedy has been delayed at every level by the BOP, even as his medical condition is severe and deteriorating rapidly. Administrative remedy with the BOP in this matter is futile and delay is causing irreparable harm to Petitioner.

As of the writing of this motion (October 24th) Petitioner still has not received a response from the Regional Director on his BP-10, nor has he received a written notice of an extention needed. He intends to consider his BP-10 constructively denied on October 28th, and will proced with a BP-11 to the Central Office of the BOP. Another example of administrative remedy being made unavailable by the BOP.

11

As set forth here, Imad Dawara, Petitioner pro se, has exhausted all administrative remedies available to him, pursuant to 42 U.S.C. § 1997(e)(A), and 28 C.F.R. § 542.15. As such, Petitioner's request for injunctive relief from this Court to prevent irreparable harm is justified and timely.

### 3. The CARES Act of 2020

On March 20, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law. As it applied to federal prisons, the CARES Act granted significant power and authority to the Bureau of Prisons in allowing them to send medically-vulnerable prisoners to home confinement. This would not only take the sick and elderly inmates out of harm's way, but it would allow prisoners remaining locked up more opportunity to social distance. On April 3, 2020, then Attorney General, William Barr, provided guidance to the BOP on how to "prioritize" the inmates being considered for release to home confinement under CARES.

Looking back it became apparent that those guidelines were too restrictive, and many inmates who should have been released under CARES Act languished in prison, many of whom died. At FCI Fort Dix, where Petitioner is incarcerated, more than 2,500 inmates tested positive for COVID-19, meaning that it is the most infected federal prison in the country. Even today, FCI Fort Dix is experiencing it's seventh (7th) known outbreak, with COVID-positive inmates on both of the prison's compounds, and being held in housing units 5706 and 5851, the unit next-door to Petitioner's (5852). (See EXHIBIT E: Memorandum for All Staff, dated October 10, 2023) The COVID-positive inmates are being housed in the same facility where inmate Dawara has his laundry washed, and where he is issued clothing to wear each week. 5851 has a

12

shared ventilation system with the laundry facility, and officers working with the COVID-positive inmates are routinely rotated into Petitioner's housing unit.

4.  BOP's Documented Problems with Chronic Care Patients

The government will argue that chronic medical conditions can be managed in prison, and that Petitioner's medical conditions are being properly managed. However, the issue is that he is unable to perform all activities of daily living, and is continuing to suffer chest pain and shortness-of-breath daily, so his medical conditions are <u>not</u> being adequately managed. The BOP's handling of chronic care patients, like Petitioner, can be seen as problematic at best, and there is a long-documented history of issues the BOP has faced in dealing with chronic care patients.

Most medical treatment is provided through the Health Services department at each federal prison. [**Health Care for Federal Prisoners**] Congressional Research Service. <u>https://crsreports.congress.gov/</u>. Even as each of these facilities has the equipment, space, and offices to perform necessary treatment, the BOP is drastically short-staffed and is unable to meet a minimum standard of care. This means that there is no one to perform the necessary testing, monitoring, and treatment on the more-than 4,000 inmates currently residing at FCI Fort Dix. The problems in treating chronic care patients for the BOP remain pervasive, mostly due to the aforementioned staff shortages. The overwhelming shortages of staff mean that medical staff, psychology staff, and chaplains are routinely working as Correctional Officers in housing units instead of performing their necessary duties.

In a recent Forbes magazine article by Mr. Walter Pavlo who is the founder of Prisonology (<u>prisonology.com</u>), a group of former BOP employees

working in criminal defense, and who specialize in medical malpractice within the federal prisons, Pavlo details the challenges of healthcare within the BOP and their difficulties following federal and state policies regarding proper medical care for inmates. [**Federal Bureau of Prisons' Medical Care Falls Short of its Own Policy**], https://www.forbes.com/sites/walterpavlo (April 19, 2022). In that Forbes article Pavlo discusses the BOP's Patient Care program statement, and the serious miss as a result of staffing shortages. The BOP's stated guidelines for each federal prison states that, for every 1,000 inmates, the BOP is to staff 1 physician, 3 mid-level practitioners, 1 registered nurse, 1 or 2 practical nurses and/or medical assistants, 2 health information technicians, and a medical clerical staff. With more than 4,000 inmates, this requires FCI Fort Dix to have on staff at least 12 mid-level practioners, to which Fort Dix currently staffs four.

In a March 2022 audit by the Office of the Inspector General ("OIG"), Department of Justice, the OIG issued a report on audits of three BOP contracts awarded to provide comprehensive medical services to federal prisoners for more than $304 million. (https://oig.justice.gov/sites/default/files/reports/22-052.pdf) The report's conclusions were:

> "[T]he BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care ... we believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard." Id., citing the OIG Report.

Also in an interview for Forbes magazine, Correctional Officer's Union President Aaron Mcglothin (FCI Mendota), responding to a question whether his facility could pass Primary Care Provider policy and standards tests for the BOP, he stated: "I know our facility definitely does not meet that criteria. We have over 1,300 inmates and we would not pass that type of

14

inspection but then again the only inspections that happen at our facilities are by agency representatives who cover for management." (emphasis added)

Meg Anderson, with National Public Radio ("NPR") has also investigated the problems with health care in federal prisons, researching deaths of people who died during or shortly after their release from federal prison. [1 in 4 Inmate Deaths Happens in the Same Federal Prison. Why?] https://npr.org/2023 /09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates, September 23, 2023. (See EXHIBIT F: Transcripts of NPR Broadcast, dated September 23, 2023) Records obtained by NPR from the Bureau of Prisons show at least 4,950 people died in its custody over the past decade. Although there are 122 federal prisons nationwide, a quarter of those deaths occurred in a single prison: the Butner Federal Medical Center in Butner, North Carolina. The prison hospital at Butner is the bureau's largest cancer treatment facility. More people in BOP custody die of cancer and heart disease than any other causes.

Sources repeatedly told NPR that too often federal prisons fail to treat serious illnesses like heart disease and cancer fast enough. NPR found numerous accounts of inmates nationwide going without needed medical care. Many waited months or even years for treatment, including inmates with obviously concerning symptoms: unexplained bleeding, a suspicious lump, chest pain, etc. Many of those suffered serious consequences, including death. Id.

When it is finally determined by BOP that someone is seriously ill with something like cancer or serious heart disease, the BOP eventually sends these inmates to a facility like the Federal Medical Center at Butner, where they are supposed to get more specialized treatment. Too often those prisoners arrive at Butner too late, and the doctors are only able to provide

15

those sick inmates with the minimum of care to keep them comfortable while they die. Both current and former inmates and medical staff within the Bureau of Prisons told NPR the federal prison system has serious issues with delays in care and staffing shortages. The BOP claims to meet the same medical standards as any independent hospital, stating on its website that it is accredited by the nation's leading accreditation agency. NPR's investigators discovered that the BOP's certifications have lapsed more than two years ago.

NPR's sources for their investigation and broadcast determined that, federal inmates, without the ability to access healthcare on their own, are dying much more often than they should. "Deaths in custody should be rare events, given that this is such a controlled environment," says Michele Deitch, director of the University of Texas at Austin's Prison and Jail Innovation Lab. "Are there preventable deaths happening in the BOP? The answer to that is clearly yes." The Bureau of Prisons refused to interview with NPR for this broadcast.

### 5. Conspiracy to Commit Arson is NOT a "Crime of Violence"

18 U.S.C. § 16 has defined "crime of violence" as follows:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another; or
>
> (b) any other offense that is a felony and that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The Supreme Court stated in Johnson v. United States, 576 U.S. 591, 135 S. Ct. 2558, 192 L.Ed 2d 569 (2015), that "The Residual Clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. The definition of violent felony provides in full:

16

> The term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such a term if committed by an adult that -
>
> > (i) has as an element the use, attempted use or threatened use of physical force against the person or property of another; or
> >
> > (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

Paragraph (i) of the definition of violence felony is known as the "force" or "elements" clause. Paragraph (ii) makes up what is known as the "enumerated-offenses" clause and the "residual" clause. United States v. Bentley, 49 F.4th 275 (3d Cir. 2022)

Some difficulties began when the Supreme Court held in Taylor v. United States, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed 2d 607 (1990) that classification as violent under the Armed Career Criminal Act ("ACCA") requires a "categorical" approach. Under the categorical approach, deciding courts must ignore the specific facts of the criminal and ask instead whether the elements of the crime are no broader than general terms. Id. at 600. The categorical approach made it difficult to predictably apply the "residual clause", as the clause itself references "conduct."

In Johnson v. United States, 576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed 2d 569 (2015), the Supreme Court reviewed the residual clause in the ACCA and found that the residual clause is unconstitutionally vague because it required a judicial assessment of some undefined "ordinary case," which was then to be used to determine the requisite "serious potential risk of physical injury." Id. As a result, the Supreme Court ruled that "imposing an increased sentence under the residual clause violates the Constitution's guarantee of due process." Id. at 2563.

17

Following <u>Johnson</u>, the Supreme Court reviewed residual clauses in other criminal statutes to determine if they passed constitutional muster. In <u>Sessions v. Dimaya</u>, 138 S.Ct. 1204, 200 L. Ed. 2d 549 (2018), the Court addressed 18 U.S.C. § 16, which defined "crime of violence" in the following manner:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. 138 S.Ct. at 1211 (quoting 18 U.S.C. § 16).

The Supreme Court ruled that the residual clause, Section 16(b), was unconstitutionally vague for the same reasons that the residual clause in <u>Johnson</u> fell short. <u>Id</u>. at 1211-12, 1213-15.6.

The Supreme Court, since their decisions in <u>Johnson</u> and <u>Dimaya</u>, have struck down other residual clauses. See <u>Baptiste v. Att'y General</u>, 841 F.3d 601, 615-21 (3d Cir. 2016); see also <u>United States v. Davis</u>, 139 S.Ct. 2319, 204 L.Ed 2d 757 (2019), in which the Supreme Court struck down the residual clause in 18 U.S.C. § 924(c)(3)(B)'s definition of a "crime of violence" as unconstitutionally vague. The U.S. Sentencing Commission also struck down a clause that mirrored the residual clause out of U.S.S.G. § 4B1.2(a). See <u>Brown v. United States</u>, 139 S.Ct. 14, 15, 202 L.Ed 2d 302 (2018).

Imad Dawara was convicted of Conspiracy to Commit Arson and Conspiracy to Defraud the United States. His crime is inchoate, and is non-violent. We ask the Court to recognize the rulings listed herein, and issue a writ of habeas corpus.

IV. CONCLUSION

The prima facie evidence in this matter is clear and overwhelming: Imad Dawara is suffering; he is unable to complete activities of daily living; his medical condition is rapidly deteriorating due to chronic ischemic heart disease; the Bureau of Prisons is delaying and neglecting appropriate medical treatment; the Bureau of Prisons is unnecessarily delaying Petitioner's administrative remedies, in violation of his rights to due process and access to the Courts; and Petitioner's medical condition would be better and more timely managed while on home confinement.

Imad Dawara respectfully implores this Honorable Court to consider the compelling circumstances presented in this case and then issue a writ of habeas corpus. The neglected medical care endured by the Petitioner under the jurisdiction of the Bureau of Prisons has not only let to undue suffering but has also raised profound questions about the duty of care owed to incarcerated individuals. We ask that the Court, in its wisdom and fairness, will take into account the undeniable consequences of this negligence on the Petitioner's health and well-being.

While justice demands accountability for any wrongdoing, it is equally important to uphold the principles of compassion and humanity, even within the criminal justice system,. Granting writ of habeas corpus to Petitioner would not only rectify the injustice suffered by the Petitioner but would also reaffirm the Court's commitment to ensuring that all individuals, regardless of their circumstances, receive adequate medical care while in custody, or be allowed to return to society under home confinement where they can seek more appropriate and more timely medical care. Petitioner respectfully submits that mercy in this matter is not a matter of leniency but

a testament to the Court's dedication to justice, equity, and the preservation of human dignity.

Date: 10-27-2023

Respectfully submitted,

Imad Dawara
Reg. No. 69939-066
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640